# United States Court of Appeals

## For the First Circuit

No. 12-2013

MARIA SANTANA-CONCEPCIÓN, ET AL.,

Plaintiffs, Appellants,

CONJUGAL PARTNERSHIP CRUZ-SANTANA, ET AL.,

Plaintiffs,

v.

CENTRO MÉDICO DEL TURABO, INC., d/b/a Hospital HIMA
San Pablo Bayamón; DR. JULIO ROSADO-SÁNCHEZ, ET AL.,

Defendants, Appellees,

HIMA SAN PABLO PROPERTIES, INC.; GRUPO HIMA SAN PABLO, INC.,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Salvador E. Casellas, U.S. District Judge]

Before

Lynch, Chief Judge,
Torruella and Lipez, Circuit Judges.

Glenn Carl James for appellants.
José Arturo González-Villamil, with whom Bufete González-Villamil was on brief, for appellees Centro Médico del Turabo, Inc., Hima San Pablo Bayamón and its insurer HIMA San Pablo Captive Insurance Company Limited.
José A. Miranda-Daleccio, with whom Miranda Cárdenas & Córdova was on brief, for appellees Dr. Julio Rosado-Sánchez and the conjugal partnership Rosado-Philippi.

September 23, 2014

**LIPEZ, Circuit Judge**. This is a medical malpractice and informed consent case from Puerto Rico involving claims by the patient and her children. The district court held that the statute of limitations barred the claims brought by the patient and her adult children, granting summary judgment to the defendants on that basis. Given that the statute of limitations does not apply to minor children until they reach majority age, the district court addressed the merits of their malpractice and informed consent claims. Concluding that the "error of judgment" defense foreclosed malpractice liability and that the failure of proof on causation foreclosed liability for lack of informed consent, the court granted summary judgment on those claims as well. We affirm.

## I.

We recount the facts in the light most favorable to the appellants, who were the non-moving party at summary judgment. O'Connor v. Steeves, 994 F.2d 905, 907 (1st Cir. 1993).

On August 16, 2006, plaintiff-appellant Santana-Concepción, a registered nurse, after submitting to a CT scan of her brain at Rochester General Hospital in Rochester, New York, was diagnosed with a large arachnoid cyst.[1] After further medical testing, Santana-Concepción's doctors there advised her that her arachnoid cyst did not require surgery.

---

[1] An arachnoid cyst is a membrane-lined fluid sac, located between the lower brain and spinal cord region of the cranium. Stedman's Medical Dictionary 353 (5th ed. 1982).

-3-

While in Puerto Rico during the fall of that year, Santana-Concepción experienced extreme pain and went to the emergency room at HIMA-San Pablo Hospital on November 15. The emergency room physician referred her to neurosurgeon Dr. Julio Rosado-Sánchez ("Dr. Rosado"), who diagnosed her with a "symptomatic arachnoid cyst" and recommended surgery and antiedema medication to help release the increased intracranial pressure. Dr. Rosado explained to Santana-Concepción that she needed an operation as soon as possible and that it could be a life-or-death situation. Santana-Concepción replied, "Good, not a problem. Do as you see fit, as far as you take away this pain. I just need this pain to go away." Dr. Rosado operated on Santana-Concepción on November 17, 2006, performing exploratory brain surgery around the cyst and placing a shunt to relieve pressure created by the cyst.

Santana-Concepción returned to Rochester that winter and visited her physician there on January 2, 2007. Her physician recorded the details of that visit as follows:

> This is a 46-year-old female with history of an arachnoid cyst, who comes in today in follow-up. She actually apparently had a VP shunt placed in Puerto Rico when she was seen in the ER [and] the cyst was evaluated there. This was in mid-November. She states that she has no further depressive symptoms. She has however, had symptoms of decreased vision, difficulty with gait and balance, and she has noticed that her voice is much louder than previously and her sons

-4-

need to have to point out to her that she is talking loudly.

She has had no seizure activity. She was started on Dilantin at that point. She did not bring her records today for me to look at.

. . .

We will look at her records and then try to get her referred back to Dr. Maxwell for neurosurgery to follow the shunt as well as Dr. Honch. Will continue the Dilantin and Depakote for now and check levels of those as a CBC and complete metabolic panel and come up with a treatment plan after we see her records.

Her son, who spoke fluent English, accompanied her on that visit.

On February 20, 2007, Santana-Concepción was hospitalized at Rochester General Hospital with symptoms of headache, dizziness, and visual changes. A CT scan and an MRI revealed that she had a shunt within her arachnoid cyst. Two days later, Santana-Concepción again met with her treating physician. Her physician recorded the details of that visit as follows:

This is a 46-year-old female with history of arachnoid cyst, S/P VP shunt placement in Puerto Rico who comes in today in follow-up from a hospital stay. She had what appears to be as a final diagnosis benign positional vertigo. However, she did see a neurologist in consult who recommended that she might consider getting the shunt taken out as it is not decreasing the size of the cyst and has seemed to result in some behavior changes.

She also complains of intermittent pain at the shunt site behind the left ear.

On April 19, 2007, Santana-Concepción visited her doctor in Rochester yet another time complaining of pain. During this visit her physician allegedly made the comment that whoever did this to her (meaning the shunt surgery) was a "butcher."

Santana-Concepción, along with her husband and four children,[2] filed this suit against Dr. Rosado and HIMA-San Pablo Hospital on March 3, 2008, a little more than a year after Santana-Concepción's second hospitalization in New York. They claimed that Dr. Rosado failed to adequately inform Santana-Concepción of the risks associated with the shunt surgery before obtaining her consent, and that he failed to abide by the prevailing medical standards applicable to the treatment he provided (i.e., engaged in malpractice). The alleged malpractice concerned the treatment decision to operate on the cyst, rather than the adequacy of Dr. Rosado's surgical technique in the operating room. The plaintiffs contended that the hospital was vicariously liable for Dr. Rosado's conduct.

The district court granted summary judgment to the defendants on all claims. The court held that the claims of Santana-Concepción and her adult children were all time-barred. It further held that the medical malpractice claim of her minor children was foreclosed by the "error of judgment" defense and the

_____

[2] Santana-Concepción's husband has since passed away. She represents his heirs' interests in this litigation.

informed consent claim failed on the element of causation.[3]  This appeal followed.

## II.

We review the district court's summary judgment decisions de novo.  Domínguez-Cruz v. Suttle Caribe, Inc., 202 F.3d 424, 428 (1st Cir. 2000).  Summary judgment is properly granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  When considering the summary judgment record, "[a]ll reasonable inferences are to be drawn in favor of the party opposing summary judgment, in this case appellant[s], just as all disputed facts are viewed in the light most favorable to [them]."  O'Connor, 994 F.2d at 907.  In assessing claims that genuine material issues exist, we must decide whether "the evidence is such that a reasonable jury could return a verdict for [Santana-Concepción or her children]."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Federal jurisdiction in this case is based on diversity of citizenship.  See 28 U.S.C. § 1332.[4]  We apply the law of Puerto Rico to the medical malpractice and informed consent claims in this

---

[3] The district court's reasoning is explained in more detail infra.  We largely track the court's analysis.

[4] Plaintiffs are residents of New York.  Defendants are residents of Puerto Rico.

-7-

case because that is where the medical treatment at issue took place.

## A. Santana-Concepción and Adult Childrens' Claims

### 1. Statute of Limitations

The plaintiffs filed suit on March 8, 2008. For the claims to survive the statute of limitations on summary judgment, there must be a genuine issue of material fact as to whether they were filed within the limitations period.

#### a. Application to Malpractice Claims of Santana-Concepción and Adult Children

Puerto Rico law affords one year to file suit for medical malpractice after "the aggrieved person ha[s] knowledge thereof." P.R. Laws Ann. tit. 31, § 5298 (2008); see also Ortiz v. Municipio De Orocovis, 13 P.R. Offic. Trans. 619, 621 (1982). Although the running of the statute of limitations does not wait for the injury to "reach its final degree of development," it does not begin to run until there is "knowledge" of the malpractice. Ortiz, 13 P.R. Offic. Trans. at 621. Such knowledge must include both the injury and the causal link between the injury and the allegedly negligent medical procedure. Guzman-Camacho v. State Ins. Fund Corp., 418 F. Supp. 2d 3, 8 (D.P.R. 2006); Rivera-Encarnación v. Estado Libre Asociado de P.R., 13 P.R. Offic. Trans. 498, 502 (1982).[5]

_____

[5] By statute Puerto Rico has established that the limitations period for medical malpractice begins not when the injury occurs, but when the patient first has knowledge of the injury. P.R. Laws Ann. tit. 31, § 5298 ("The following prescribe in one (1) year:

Under the law of torts in Puerto Rico, including medical malpractice and lack of informed consent, relatives are entitled to "compensation for the sufferings, emotional distress, or mental anguish experienced as a consequence of the material or other damages caused directly to their relatives." Santini-Rivera v. Serv Air, Inc., 137 P.R. Dec. 1, 10-12 (1994). The period available to exercise such an action is one year, and begins to run when the plaintiffs learn about the damages suffered by the relative-victim. Id.

With regard to the medical malpractice claims of the plaintiff and her adult children, the statutory clock began ticking soon after the onset of Santana-Concepción's first negative post-operation symptoms. Santana-Concepción sought treatment for these symptoms in early 2007. The symptoms were first documented on January 2, 2007, and then on her subsequent visits to the hospital in February 2007. The neurologist who examined Santana-Concepción in February recommended "getting the shunt taken out as it [was] not decreasing the size of the cyst and ha[d] seemed to result in some behavior changes."

Santana-Concepción nonetheless contends that because she did not understand English, and therefore could not read the notes

. . . (2) Actions to demand civil liability for grave insults or calumny, and for obligations arising from the fault or negligence mentioned in § 5141 of this title [which includes medical malpractice], from the time the aggrieved person had knowledge thereof.").

-9-

from her hospital visits, she did not learn that her symptoms were related to the shunt surgery until April 2007 when a doctor told her about the problem. This version of events ignores multiple undisputed facts in the record. First, Santana-Concepción was accompanied by her English-speaking son when she visited Rochester General Hospital on January 2, 2007. Furthermore, the notes from that visit include a remark from the doctor that "[s]he actually apparently had a VP shunt placed in Puerto Rico when she was seen in the ER [and] the cyst was evaluated there. This was in mid-November." Indeed, at that visit the doctor apparently recommended that she consider having the shunt removed because it was not decreasing the size of the cyst and may be causing some of the behavioral issues. However, the notes also reveal that she did not bring her medical records with her to the exam. Thus, the doctor could have known about the shunt procedure only if she informed him of it during the visit. No reasonable jury, confronted with this undisputed evidence, could conclude that Santana-Concepción, or her adult children, were not aware of <u>any</u> adverse consequences of her surgery by January 2, 2007. Accordingly, the district court properly granted summary judgment on the medical malpractice claims of Santana-Concepción and her adult children.

### b. Application to the Informed Consent Claims of Santana-Concepción and Adult Children

The statute of limitations for a physician's failure to obtain the patient's informed consent for surgery, a cause of

action separate from a medical malpractice claim, begins to run when the aggrieved learns that she was subjected to an unauthorized medical procedure. Villarini-Garcia v. Hosp. Del Maestro, Inc., 8 F.3d 81, 84-85 (1st Cir. 1993) (citing P.R. Laws Ann. tit. 31, § 5298). A claim, such as the one here, premised on the alleged failure of the physician to adequately inform the patient of potential negative consequences, is akin to a failure-to-warn claim in the medical context. We have said that the statute begins to run for those claims at the point when "a reasonable person [would] conclude that a warning of such possible consequences should have been given before the operation." Id. at 85.

With regard to the informed consent claims of Santana-Concepción and her adult children, the cause of action accrued when they learned that she was experiencing negative side effects of the shunt operation performed by Dr. Rosado. The presence of a shunt in Santana-Concepción's cyst was documented in the treatment notes from her January 2, 2007 consultation with her doctor, the CT and MRI records from her hospitalization on February 20, 2007, and the treatment notes from her follow-up consultation on February 22, 2007. At those consultations, Santana-Concepción discussed various symptoms that she had been experiencing since the shunt was put in place, including "decreased vision, difficulty with gait and balance," and pain at the shunt site. In addition, the notes from Santana-Concepción's February 22 follow-up visit show that she

-11-

discussed the potential removal of the shunt to alleviate her symptoms with the neurologist who tended to her while she was hospitalized. A reasonable jury, confronted with this undisputed evidence, would be compelled to find that, at least by February 22, 2007, a reasonable person would have concluded that she should have been warned of the previously undisclosed potential negative consequences of shunt surgery. Accordingly, the district court properly granted summary judgment on Santana-Concepción's informed consent claim.

At least one of the other adult plaintiffs, Santana-Concepción's sons Herminino and Carlos Manuel, was present at each of her consultations with doctors in January and February 2007 in New York to translate their mother's interactions with her doctors. Hence, the brothers received contemporaneous indications that Santana-Concepción's shunt surgery had negative consequences, the risks of which should have previously been disclosed to her.[6] Accordingly, the district court properly dismissed the informed consent claims of the adult children.

---

[6] This is not a case where the informed consent claims of a patient's relatives potentially accrue later than the patient's own claims because the relatives did not contemporaneously learn the details of a particular medical procedure and its effects.

-12-

## B.  Minor Plaintiffs' Claims[7]

"In Puerto Rico, statutes of limitations do not run against minors until they reach the legal age of 21." Ocasio-Berios v. Bristol Myers Squibb, 73 F. Supp. 2d 171, 174 (D.P.R. 1999); P.R. Laws Ann. tit. 32, § 254(1) ("If a person entitled to bring an action, other than the recovery of real property, be at the time the cause of action accrued . . . [w]ithin the age of majority . . . the time of such disability is not a part of the time limited for the commencement of the action.").  Hence, the minor plaintiffs' claims cannot be defeated by the statute of limitations at summary judgment.  Recognizing this legal proposition, the district court addressed the claims of the minor children on the merits.

### 1.  Medical Malpractice

In Puerto Rico a medical malpractice plaintiff must establish three elements:  "(1) the basic norms ('normas minimas') of knowledge and medical care applicable to general practitioners

---

[7] Puerto Rico courts have "recognized the right of a person to receive compensation when his or her spouse or other relative suffers harm in the most diverse situations [including] in cases of . . . medical malpractice." Santini-Rivera, 137 P.R. Dec. at 8; see P.R. Laws Ann. tit. 31, § 5141 (providing a cause of action against a tortfeasor who "causes damage to another through fault or negligence" (emphasis added)).  Acknowledging that "the Puerto Rico Supreme Court consistently has referred to relatives' causes of action as 'separate' or 'independent' from the principal plaintiff's claim," we have analyzed the application of the statute of limitations to them as standalone claims. González Figueroa v. J.C. Penney P.R., Inc., 568 F.3d 313, 321 (1st Cir. 2009).

or specialists; (2) proof that the medical personnel failed to follow these basic norms in the treatment of a patient; and (3) a causal relation between the act or the omission of the physician and the injury by the patient." Santiago v. Hosp. Cayetano Coll y Toste, 260 F. Supp. 2d 373, 381 (D.P.R. 2003) (collecting cases).

Puerto Rico courts have long recognized a defense of "error of judgment," which defeats the second element of the tort. Under that doctrine, when the evidence shows that different courses of treatment existed for the injured party's condition, and legitimate debate existed between medical experts as to which treatment would be appropriate, a physician's judgment call cannot be the basis for a medical malpractice claim. Lozada v. Estado Libre Asociado de P.R., 16 P.R. Offic. Trans. 250, 267 (1985); Oliveros v. Abréu, 1 P.R. Offic. Trans. 293, 315 (1973) ("[A physician] is not liable of malpractice when he is faced with a situation where educated and reasonable doubt about what should be the course to follow is present."). "It is, therefore, insufficient for a plaintiff in a malpractice case merely to show that another doctor would have chosen to treat the patient in a manner different from the manner in which the attending physicians treated him." Rolon-Alvarado v. Municipality of San Juan, 1 F.3d 74, 78 (1st Cir. 1993). The district court found that defense applicable here.

The medical malpractice alleged here is the decision of Dr. Rosado to perform the shunt placement operation on Santana-Concepción. Specifically at issue was whether her cyst warranted surgical or pharmacological treatment.[8] Santana-Concepción argued that because her cyst did not cause hydrocephalus,[9] a fact that is undisputed, it was not "symptomatic" and surgery would never be indicated.

The summary judgment record includes the deposition testimony of plaintiffs' expert, Dr. Ravi Tikoo. When asked about the shunt procedure performed on Santana-Concepción, Dr. Tikoo testified as follows:

> Q [defense counsel]. Doctor, would you agree with this statement: Treatment for arachnoid cysts is symptomatic?
>
> A. Depending on how you're defining symptomatic; yes.
>
> Q. How are you defining it.
>
> A. When someone has significant hydrocephalus or severe symptoms and exam findings from the cyst.
>
> Q. But it doesn't have to be hydrocephalus only; is that correct?

---

[8] There is no evidence in the record that a surgical treatment option, other than placing a shunt, existed.

[9] Hydrocephalus is "a condition in which the primary characteristic is excessive accumulation of fluid in the brain." National Institute of Neurological Disorders and Stroke, "Hydrocephalus Fact Sheet," available at http://www.ninds.nih.gov/disorders/hydrocephalus/detail_hydrocephalus.htm (last visited August 22, 2014).

A. Correct.

Q. Would you agree with this: When symptoms warrant, the surgical placement of a shunt may be required to decompress the cyst?

A. Can you repeat that?

[question repeated]

A. Yes.

Q. Doctor, would you agree that the decision of when it is that the symptoms warrant shunting is a clinical judgment call?

A. To a certain extent, yes.

Q. And that call, you have never taken it in your life?

A. Correct.

Q. Doctor, would you agree with the following: Untreated arachnoid cysts may cause permanent severe neurological damage due to the progressive expansion of the cyst or hemorrhage?

A. In the appropriate circumstance, yes.

Q. Would you agree with the following statement: With treatment, most individuals with symptomatic arachnoid cysts do well?

A. Many, yes.

Q. Doctor, would you agree with the following: Controversy surrounds the treatment of arachnoid cysts?

A. Yes.

Q. Some clinicians advocate treating only patients with symptomatic cysts whereas others believe that even [a]symptomatic cyst[s] should be decompressed to avoid future complications?

A.  I would - my opinion is that doctors that recommend asymptomatic - treatment of asymptomatic cysts are not in the majority, they are probably in the minority.

Q.  But there are some authorities that state that also?

A.  In my opinion, those authorities are not reasonable or credible.

Q.  But those authorities or school of thought exist?

A.  Yes.

Q.  And you don't agree with that, but others don't agree with you; is that correct?

A.  I guess so; yes.

Q.  Would you agree with the following:  The most effective surgical treatment appears to be excision of the outer cyst membrane and cystoperitoneal [sic] shunting?

A.  In the appropriate circumstance; yes.

In addition, Santana-Concepción's responses to interrogatories indicated that she "felt [her] eyes were going to fall [sic] of their socket" when she saw Dr. Rosado for the first time.  It was at the conclusion of that examination that Dr. Rosado recommended surgery to place a shunt and relieve intracranial pressure.

On this record, a reasonable jury would be compelled to conclude that legitimate debate existed among medical experts as to which treatment would be appropriate for Santana-Concepción's arachnoid cyst, which, though not causing hydrocephalus, did cause significant pain.  Lozada, 16 P.R. Offic. Trans. at 267.  Given the

-17-

testimony of the plaintiffs' own expert, they were unable to generate a genuine issue of material fact as to the application of the "error of judgment" defense.  Hence, the district court was correct to grant summary judgment to the minor plaintiffs on their medical malpractice claims.

### 2.  Informed Consent

The remaining claim of the minor plaintiffs is based on the doctrine of informed consent, which "imposes on physicians the duty to inform their patients about the nature and risks of the proposed medical treatment in order to place the patients in a position to reach an intelligent and informed decision." Lozada-Tirado v. Tirado-Flecha, 177 P.R. Dec. 893 (2010).  The minor plaintiffs claim that Dr. Rosado performed the shunt placement surgery on Santana-Concepción without obtaining her fully informed consent.

The scope of the duty to inform does not reach every remote, hypothetical risk posed by a medical procedure.  Indeed, the scope of the duty varies with the nature of the proposed treatment.  Sepúlveda de Arrieta v. Barreto, No. RE-90-41, 1994 WL 908876 (P.R. Dec. 23, 1994).  "'If [the medical intervention] is to save a life, the surgeon should, above all, create a favorable atmosphere.  If the intervention is simply useful, he must then be more precise in his disclosure.'" Id. (emphasis omitted) (quoting J. Ataz López, Los médicos y la responsabilidad civil 74 (1985)).

In order to prevail on a claim for lack of informed consent, a plaintiff must prove that the complained-of injury resulted from the failure of the physician to fully inform the patient (i.e., causation).  Sepulveda de Arrieta, No. RE-90-41, 1994 WL 908876.  One might expect that such causation can be proved by showing that the plaintiff would not have consented to the medical treatment at issue if fully informed of the risks.  The debate in most U.S. jurisdictions is generally over whether that fact must be shown subjectively (i.e., from the perspective of the specific patient) or objectively (i.e., from the perspective of the reasonable patient).  Id.

"Contrary to the United States model -- that focuses on the decision-making process of the injured party, whether objective or subjective -- civil law tradition focuses on the alleged aggravating circumstance."  Id.  Hence, in Puerto Rico, the question of proximate causation is viewed from the perspective of the physician.  In other words, the analysis does not turn on whether the patient would have declined to consent if provided with the allegedly absent information.  See id. ("[I]t is not necessary to determine if she, as a patient -- subjectively or objectively -- would or would have not consented to the proposed medical treatment.").  Instead, the pertinent question is "whether in the normal course of events [the physician] had to foresee that the lack of pertinent information would lead [the] patient . . . to

-19-

take a different decision than the one she would have taken if she had been suitably informed." Id. The district court held that it would not have been foreseeable that any further disclosure would have changed Santana-Concepción's decision to undergo surgery. The court granted summary judgment on that basis.

Here, the minor plaintiffs claim that Santana-Concepción was never fully informed of the risks of surgery and was never told that foregoing surgery was a viable option. The record includes an informed consent form signed by Santana-Concepción, the authenticity of which is not dispute. The minor plaintiffs nonetheless argue that Santana-Concepción was not fully informed because four terms on the form (arachnoid cyst, drainage, fenestration, and shunt) were in English rather than Spanish (which was the language of the rest of the document). They also argue that Dr. Rosado did not tell Santana-Concepción that her condition was manageable without surgery, instead implying that the shunt surgery was a life-saving necessity.

Both of these arguments focus on the wrong perspective, however. As explained above, we must examine the question of foreseeability from Dr. Rosado's perspective, not Santana-Concepción's. The district court was correct in explaining that "to create a genuine issue of fact under the applicable foreseeability standard, plaintiffs needed to direct the Court to facts Dr. Rosado could have relied upon to foresee that

-20-

Santana-Concepción was likely to behave different than most people under the circumstances. [However,] [p]laintiffs have provided no evidence whatsoever in this regard." Dr. Rosado was confronted with a patient who had a cyst on her brain that was causing her debilitating pain. He understood it to be a possible life-or-death situation and communicated that to her. Santana-Concepción indicated a willingness to entertain any treatment option that would take away her pain. Doing nothing was simply not an acceptable option, even if Dr. Rosado had suggested it. Dr. Rosado ultimately suggested a surgical procedure to relieve some of the pressure. However, before performing the surgery, Dr. Rosado informed Santana-Concepción and her family of the major risks of surgery and obtained written consent.

As the district court put it, "[t]he conclusion that Dr. Rosado could have foreseen a decision to forego surgery by Santana-Concepción is inconceivable under these circumstances." In other words, the minor plaintiffs failed to generate a genuine issue of material fact on the proposition that Dr. Rosado could have foreseen that providing Spanish translations for the four English terms, or further discussing some of the possible side effects of surgery as reasons for not undergoing it, would have changed Sanatana-Concepción's decision to consent to surgery. Accordingly,

the district court was correct to grant summary judgment to the defendants on the informed consent claims of the minor plaintiffs.[10]

**Affirmed**.

---

[10] Because, as explained <u>supra</u>, the hospital and related entities were sued on the basis of vicarious liability for Dr. Rosado's actions, all claims against those corporate defendants fail with the claims against him.